**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| AVIAD BESSLER, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ZAFGEN, INC. and THOMAS E. HUGHES,<br><br>Defendants. | Civil Action No. 1:15-cv-13618<br><br>CLASS ACTION<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>DEMAND FOR JURY TRIAL |

Lead Plaintiffs Terry Brennan, Ron Kenner, Kevin Koziatek, Vincent Rampe, and Dragon Gate Management Ltd., and Plaintiff Jeffrey Buterbaugh ("Plaintiffs"), by and through their attorneys, allege upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters, based upon the investigation conducted by and through their attorneys, which included, among other things, a review of documents filed by Defendants with the United States Securities and Exchange Commission (the "SEC"), news reports, press releases issued by Defendants, and other publicly available documents, as follows:

**NATURE AND SUMMARY OF THE ACTION**

1. This is a federal securities class action on behalf of all investors who purchased or otherwise acquired common stock of Defendant Zafgen, Inc. ("Zafgen," or the "Company") between June 19, 2014 through October 16, 2015, inclusive (the "Class Period"), and were damaged thereby. This action is brought on behalf of the Class for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

2. Zafgen is a small pharmaceutical company whose valuation depends on a single drug—an anti-obesity therapy called beloranib. At all relevant times, Zafgen had approximately twelve or fewer full-time employees. In its initial public offering ("IPO") prospectus,[1] Zafgen described a number of previously completed clinical trials of beloranib and disclosed that "there were two serious thrombotic adverse events" in one of the Phase 2 trials of beloranib (the ZAF-201 trial—completed prior to Zafgen's IPO).[2] Zafgen repeated this statement in multiple other filings throughout the Class Period. Until October 16, 2015, Zafgen had never disclosed any other or additional thrombotic adverse events related to beloranib.

3. In September 2015, there was heavy and unusual selling by insiders, including the Company's Chief Executive Officer (Defendant Thomas E. Hughes), Chief Medical Officer, and Chief Commercial Officer. Then, beginning on October 12, 2015, Zafgen shares plummeted. Between the opening of trading on October 12, 2015 and the close of trading on October 13, 2015, Zafgen shares dropped from $34.76/share to $15.75/share—a 54.7% drop.

4. The only publicly available news that appeared to contribute to the drop on October 12 and 13, 2015 was a report that the Company had cancelled an upcoming scheduled appearance at an RBC Capital Conference. As the Boston Globe subsequently reported, however, rumors of a patient death in an ongoing Phase 3 beloranib study had begun circulating in the marketplace as early as October 13, 2015.

5. On October 14, 2015, Zafgen confirmed that a patient in its Phase 3 trial of beloranib had died. Zafgen disclosed neither whether the patient received beloranib or a placebo nor anything about thrombotic adverse events in prior beloranib clinical trials.

---

[1] The IPO occurred on June 19, 2014.

[2] Thrombotic adverse events refers to adverse events associated with the formation of blood clots.

6. The Company's stock price rose on this partial, misleading disclosure. After trading as low as $10.90/share, prior to the partial misleading disclosure, Zafgen stock closed on October 14, 2015 at $19.50 per share on abnormally high volume. The stock continued to trade up on October 15, 2015, as high as $22.15/share, closing at $21.02/share.

7. Late in the day on October 15, 2015, well after the close of trading, the Food and Drug Administration ("FDA") placed beloranib on partial clinical hold, forcing Zafgen to make corrective disclosures on October 16, 2015, before the start of trading, including: (i) the patient who died was receiving beloranib; and (ii) there had been **four** thrombotic adverse events in the ZAF-201 trial—*two more than previously reported*—as well as two additional, previously undisclosed thrombotic events in ongoing studies, for a total of **seven** thrombotic events out of 400 patients receiving beloranib compared to **zero** thrombotic events in the approximately 150 patients treated with a placebo.

8. The Company's stock dropped sharply after these corrective disclosures. After closing at $21.02/share on October 15, 2015, Zafgen stock closed at $10.36/share on October 16, 2015—a 50.7% drop.

## JURISDICTION AND VENUE

9. The federal law claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and § 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, as well as under the common law.

10. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 27 of the Exchange Act, 15 U.S.C. § 78aa.

11. This Court has jurisdiction over the Defendants named herein because Defendants sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

12. Venue is proper in this District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b), as Zafgen has its principal executive offices located in this District and conducts substantial business therein.

13. In connection with the acts, omissions, conduct and other wrongs in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including but not limited to the United States mail, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

14. Lead Plaintiff Terry Brennan acquired and held shares of the Company at artificially inflated prices during the class period, as set forth in the accompanying certification, and has been damaged by the revelation of Zafgen's material misrepresentations and material omissions.

15. Lead Plaintiff Ron Kenner acquired and held shares of the Company at artificially inflated prices during the class period, as set forth in the accompanying certification, and has been damaged by the revelation of Zafgen's material misrepresentations and material omissions.

16. Lead Plaintiff Kevin Koziatek acquired and held shares of the Company at artificially inflated prices during the class period, as set forth in the accompanying certification, and has been damaged by the revelation of Zafgen's material misrepresentations and material omissions.

17. Lead Plaintiff Vincent Rampe acquired and held shares of the Company at artificially inflated prices during the class period, as set forth in the accompanying certification, and has been damaged by the revelation of Zafgen's material misrepresentations and material omissions.

18. Lead Plaintiff Dragon Gate Management Ltd. acquired and held shares of the Company at artificially inflated prices during the class period, as set forth in the previously filed certification,[3] and has been damaged by the revelation of Zafgen's material misrepresentations and material omissions.

19. Plaintiff Jeffrey Buterbaugh acquired and held shares of the Company at artificially inflated prices during the class period, as set forth in the accompanying certification, and has been damaged by the revelation of Zafgen's material misrepresentations and material omissions.

20. Defendant Zafgen, Inc., is a Delaware corporation with its principal place of business in Boston, Massachusetts. Zafgen trades on the NASDAQ stock exchange under the ticker symbol "ZFGN," and describes itself as "a biopharmaceutical company dedicated to significantly improving the health and well-being of patients affected by obesity and complex metabolic disorders." Zafgen was founded in 2005 and went public on June 19, 2014.

21. Defendant Thomas E. Hughes is Zafgen's Chief Executive Officer and has served in that role since 2008. Dr. Hughes holds a Ph.D in nutritional biochemistry from Tufts University and has decades of experience in the pharmaceutical sector. Prior to joining Zafgen, Dr. Hughes was vice president and global head, cardiovascular and metabolism disease area, at the Novartis Institutes for BioMedical Research, Inc. in Cambridge, Massachusetts where he directed drug discovery research teams specializing in cardiovascular disease, type 2 diabetes and related metabolic disorders.

---

[3] The previously filed certification for Dragon Gate Management Ltd. includes all of its trades during the Class Period.

## RELEVANT NON-PARTIES

22. Dennis Kim is the Company's Chief Medical Officer and has served in that role since 2011.

23. Alicia Secor is the Company's Chief Commercial Officer and has served in that role since January 2014.

24. Bruce Booth is a partner at the venture capital firm, Atlas Venture ("Atlas"), and was a member of Zafgen's board of directors from 2006 to December 8, 2015.

25. Avi Goldberg was a member of Zafgen's board of directors from November 2005 to December 8, 2015.

## SUBSTANTIVE ALLEGATIONS

### A. Background

26. Like many small pharmaceutical companies, Zafgen's valuation depends on the success of a single drug, an obesity therapy called beloranib. Zafgen's most recent Form 10-K describes beloranib as "our lead product candidate … a novel, first-in-class, twice-weekly subcutaneous, or SC, injection," to treat "severe obesity in two rare diseases, Prader-Willi syndrome, or PWS, and hypothalamic injury-associated obesity, or HIAO, including craniopharyngioma-associated obesity; and severe obesity in the general population."

27. A description of Zafgen's product pipeline available on its website, shows that beloranib is the only candidate that is past the pre-clinical stage:




28. In total, Zafgen has conducted three Phase 1 trials, four Phase 2 trials, and one Phase 3 trial of beloranib for the different obesity-related diseases that it believes beloranib may treat.

29. Prior to its IPO, Boston-area venture capital firms, Atlas and Third Rock Ventures (“Third Rock”), each owned approximately 35% of the Company. As of the Company’s most recent annual proxy filing (made on April 30, 2015), Atlas and Third Rock each owned approximately 21% of the Company.

30. In a June 25, 2014 article, published on his personal website (http://lifescivc.com), Bruce Booth, a partner at Atlas who formerly acted as Zafgen’s Chief Operating Officer and was a member of Zafgen’s board, wrote an article commenting on Zafgen’s unique “virtual operating model,” stating:

> Outside of a brief stint in 2008, we never had our own laboratories or scientists in white coats. Jim [Vath] ran the scientific plans during the seed phase from our offices, and when Tom [Hughes] came in he quickly decided to focus resources on collaborative CRO relationships rather than in-house infrastructure. Over the past year, we’ve grown by 100% – **from around 4-6 “in-house” folks for most of first six years or so to a dozen FTEs** [full-time employees] now.[4]

[4] Unless otherwise noted, all emphasis herein is added.

31. In other words, Defendant Hughes and the Company's other officers were, at all relevant times, one of a dozen or fewer full-time employees. Thus, they should have been intimately familiar with all relevant details of the Company's operations, including clinical trials of its lead product.

32. In that same article, Booth suggested that Zafgen had a history of engaging in "hand-waving" about the meaning of its data, playing fast-and-loose with its descriptions of how beloranib worked. According to Booth:

> The early data that showed unprecedented 'too good to be true' effects in rodent models of obesity with metAP2 inhibition were reproducible, real, and fully penetrant – the drugs always seem to work. But the scientific explanation at the time, which was an anti-angiogenesis approach to the shrinking vascularized adipose tissue – turned out to be wrong. Tom [Hughes] and the team spent a lot of time developing the mechanistic understanding of the biology, but it's fair to say **the first few years were spent hand-waving**[[5]] **around the wrong mechanism to describe the great data.** Furthermore, the drug candidates we were chasing were primarily covalent-modifiers (think Avila-like), and had complex PK-PD relationships. The team worked through these issues and more clearly defined the mechanism, but its fair to say the scientific complexity of the program in its early days was of 'higher than average' difficulty.

**B. Zafgen's Management Is Incentivized To Boost Its Stock Price**

33. As the following table (taken from the Company's April 30, 2015, Schedule 14A (the "Annual Proxy")) demonstrates, a significant portion of Zafgen executives' annual compensation consists of "Option Awards" and "Non-Equity Incentive Plan Compensation" (*i.e.*, "performance-based cash bonuses"):

[5] In technical communities, the term "hand-waving" is a pejorative term used to describe misdirection or distraction. *See, e.g.*, Eric S. Raymond, THE NEW HACKER'S DICTIONARY 240 (MIT Press 1996) ("handwave [poss. from gestures characteristic of stage magicians] 1. *v.* To gloss over a complex point; to distract a listener to support a (possibly actually valid) point with blatantly faulty logic.").

| Name and Principal Position | Year | Salary ($) | Option Awards[(2)] ($) | Non-Equity Incentive Plan Compensation[(1)] ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|
| Thomas E. Hughes, Ph.D. | 2014 | 425,000 | — | 178,500 | 5,200[(6)] | 608,700 |
| *Chief Executive Officer* | 2013 | 400,000 | 591,961 | 120,000 | 5,100[(6)] | 1,117,061 |
| Patrick Loustau | 2014 | 195,385[(3)] | 3,379,818 | 70,000 | 29,332[(5)] | 3,674,535 |
| *President* | | | | | | |
| Alicia Secor | 2014 | 328,750[(4)] | 1,161,651 | 99,000 | 5,200[(6)] | 1,594,601 |
| *Chief Commercial Officer* | | | | | | |

34. These option awards incentivized management to inflate the Company's stock price because, of course, the value of the options is tied directly to the value of the stock.

35. The performance-based cash bonuses also incentivized Zafgen's officers to increase the Company's stock price. The Company's bonus plan measures executives' performance by increases in share price. In its Annual Proxy, the Company described its "Stock Option and Incentive Plan" under which Zafgen's covered employees have been compensated since its IPO. As set out in the Annual Proxy, the criteria for awards under the Stock Option and Incentive Plan may include, *inter alia*, "total shareholder return," (the first criteria listed) and "changes in the market price of the common stock."

### C. Defendants Knew That Beloranib Could Elevate Patients' Risk of Thrombotic Adverse Events

36. At all times during the Class Period, Defendants knew—or were reckless in not knowing—that there was a significant risk of thrombotic adverse events in future clinical trials of beloranib.

37. Beloranib is different from traditional weight-loss treatments, many of which focus on appetite suppression. Instead, beloranib is an inhibitor of the methionine aminopetidase 2 (MetAP2) enzyme, which Zafgen believes to "have intracellular actions that lead to reduced fat biosynthesis and increased fat oxidation and lipolysis." *See* T.E. Hughes, D.D. Kim, J. Marjason, J. Proietto, J.P. Whitehead, and J.E. Vath, *Ascending Dose-Controlled Trial of*

*Beloranib, a Novel Obesity Treatment for Safety, Tolerability, and Weight Loss in Obese Women*, 21:9 OBESITY (September 2013). (As noted in the pipeline graphic above, Zafgen's other two products are also MetAP2 inhibitors).

38. As Defendant Hughes noted in the 2013 article cited above, MetAP2 inhibitors, like beloranib, were originally "developed as anti-angiogenic agents for the treatment of cancer," and "in xenografted mice, high doses of beloranib suppress angiogenesis and tumorigenesis."[6]

39. Other angiogenesis inhibitors (*i.e.*, agents that suppress angiogenesis) have been associated with an increased risk of thrombotic side effects. For example, the National Cancer Institute's short "fact sheet," discussing angiogenesis inhibitors, expressly notes the risk of thrombotic side effects:

> **Do angiogenesis inhibitors have side effects?**
>
> Initially, it was thought that angiogenesis inhibitors would have mild side effects, but more recent studies have revealed the potential for complications that reflect the importance of angiogenesis in many normal body processes, such as wound healing, heart and kidney function, fetal development, and reproduction. Side effects of treatment with angiogenesis inhibitors can include problems with bleeding, **clots in the arteries (with resultant stroke or heart attack)**, hypertension, and protein in the urine. Gastrointestinal perforation and fistulas also appear to be rare side effects of some angiogenesis inhibitors. Animal studies have revealed the potential for birth defects, although there is no clinical evidence for such effects in humans.
>
> It is likely that some of the possible complications of angiogenesis inhibitor therapy remain unknown. As more patients are treated with these agents, doctors will learn more about possible rare side effects.

40. Multiple scientific studies have documented the elevated thrombotic risk that angiogenesis inhibitors such as beloranib pose. For example, a 2002 article in NATURE BIOTECHNOLOGY—Ken Garber, *Angiogenesis inhibitors suffer new setback*, NATURE

[6] Angiogenesis is the formation of new blood vessels.

BIOTECHNOLOGY 20, 1067 - 1068 (2002)—noted that anti-angiogenesis agents could lead to thrombotic side effects:

> Other problems with the anti-angiogenesis strategy have become apparent. Angiogenesis inhibitors were expected to show little toxicity because they act only on proliferating blood vessels, which are usually present only in tumors. But a disturbing side effect came to light in one trial of SU5416 in conjunction with chemotherapy, in which **8 out of 19 patients suffered serious clotting**, including two strokes. After halting the trial, the Dutch clinical team concluded that SU5416 was the likely cause. Their explanation: VEGF doesn't just help new blood vessels grow, but also protects existing blood vessels, and disrupting VEGF signaling can lead to coagulation. Giuseppe Giaccone of the Vrije Universiteit Medical Center in Amsterdam notes: 'I do not think we can generalize the findings of SU5416 to other VEGF inhibitors, although **it is quite possible that this type of toxicity [is] typical of this class of agents.**'
>
> Although clotting rates were much lower in other trials of SU5416 and Avastin, **doctors are now taking the risk seriously. 'I'd probably look for anyone who has a history of bleeding or thrombosis and keep them off [clinical trials]**,' says Herbst. But angiogenesis inhibitors are envisioned as chronic maintenance therapy, and the emergence of unexpected toxicities has further clouded their future.

41. Similarly, a 2008 review article stated that "thrombotic events, which can be fatal, have been described in patients treated with angiogenesis inhibitors," and listed eight different angiogenic inhibitors associated with thrombotic events, including Avastin, Aflibercept, Suramin, Suradista, ZD6474, Everolimus, Prinomastat, and Vitaxin. *See* Jose L. Mauriz, Javier Gonzalez-Gallego, *Antiangiogenic Drugs: Current Knowledge and New Approaches to Cancer Therapy*, 97:10 JOURNAL OF PHARMACEUTICAL SCIENCES (Oct. 2008). A 2009 paper stated that ""[m]any new biological agents with anti-angiogenic properties appear to be associated with an increased risk for thrombosis[.]" *See* Francesca Elice, Francesco Rodeghiero, Anna Falanga, Frederick R. Rickles, *Thrombosis associated with angiogenesis inhibitors*, BEST PRACTICE & RESEARCH CLINICAL HAEMATOLOGY 22:1 (March 2009).

42. As Zafgen stated in its Form S-1 filed on March 18, 2014 (as well as in subsequent filings), beloranib is a "structural analog" of fumagillin. Fumagillin is a complex

biomolecule, used as an antimicrobial agent and is known to have anti-angiogenic effects. In a study published in 2013, researchers found that "fumagillin may trigger cell membrane scrambling of erythrocytes, a hallmark of eryptosis, the suicidal death of erythrocytes."[7] In turn, "triggering of eryptosis favours the development of thrombosis." *See* Mohanad Zbidah, Adrian Lupescu, Kashif Jilani, Florian Lang, *Stimulation of Suicidal Erythrocyte Death by Fumagillin*, BASIC & CLINICAL PHARMACOLOGY & TOXICOLOGY 112:5 (May 2013).

43. The significance of thrombotic risk was only heightened by the patient profile that Zafgen was targeting. As Zafgen itself acknowledged in the IPO Prospectus for the Company's initial public offering, filed with the SEC on June 19, 2014, (and elsewhere), "severely obese patients are at an increased risk for cardiovascular disease."

44. Defendants therefore clearly knew, or recklessly disregarded, that these risks were relevant to beloranib. For example, a 2009 article in the MIT TECHNOLOGY REVIEW, about Zafgen and beloranib, for which Defendant Hughes was interviewed, stated that "anti-angiogenic drugs such as Avastin, used to treat breast, lung, and colon cancer, have unpleasant side effects–especially when used long term–including problems with the reproductive, **cardiovascular**, and immune systems." *See* Jocelyn Rice, *Co-opting a Cancer Treatment to Spur Fat Loss*, MIT TECHNOLOGY REVIEW (July 15, 2009). A clinical article about beloranib published in March, 2015 stated that "[t]he safety of beloranib in particular will need to be evaluated carefully. … Other angiogenesis inhibitor drugs have been associated with bleeding, hypertension, proteinuria, and fatal **cardiovascular events**, and angiogenesis inhibition may impair wound healing and tissue repair." *See* Robert H. Howland, *Aspergillus, Angiogenesis, and Obesity: The*

[7] Erythrocytes are also known as red blood cells.

*Story Behind Beloranib*, JOURNAL OF PSYCHOSOCIAL NURSING AND MENTAL HEALTH SERVICES 53:3 (March 2015).

45. At the time Zafgen conducted its ZAF-201 trial—between August 2012 and May 2013—Defendants knew of potential cardiovascular risks to patients enrolled in the clinical trial.[8] According to the definitive prospectus for the Company's initial public offering, filed with the SEC on June 19, 2014, in conducting the ZAF-201 trial—which is the particular focus of this Complaint and which was completed prior to the IPO— the Company specifically "measured systemic biomarkers of **cardiovascular disease risk**, including low density lipoprotein cholesterol, HDL, CRP, trigylcerides and blood pressure in trial participants, to determine beloranib's impact on such biomarkers." According to that same document, after the ZAF-201 trial was complete, Zafgen recognized the potential "utility of **assessment of prior history of thrombotic events** in patients enrolled in subsequent trials and added vigilance for [adverse events] related to blood clotting during future clinical trials."

46. On an October 16, 2015 call with analysts, Zafgen's Chief Medical Officer Dennis Kim confirmed that the Company did, in fact, begin screening for a predisposition toward thrombotic events, following the completion of ZAF-201 study in May, 2013:

> Analyst: [G]iven that you had had prior thrombotic events, why weren't you screening for, uh, predisposition to thrombotic events in the patients already?
>
> * * *
>
> Dennis Kim: We were screening, yeah. We were screening for predisp, predispositions, um, as I mentioned before we were checking coagulation profiles, platelet counts, and history

[8] Obviously, cardiovascular risk can include thrombotic events. The World Heart Federation's "fact sheet" describes "deep vein thrombosis"— "a condition where blood clots form in the veins"—as a type of cardiovascular disease.

of, uh, prior thrombotic events. Um, you know, prior to starting study 311 and study 203, we had had 2 cases of pulmonary embolism in study 201…

### D. Adverse Thrombotic Events In The ZAF-201 Trial

47. Zafgen conducted ZAF-201—its Phase 2a proof-of-concept clinical trial—over 12 weeks with 160 obese patients, of whom 122 were dosed with beloranib. The Company enrolled participants at eight study sites in Australia beginning in August 2012, and the study was completed in May 2013.

48. As Zafgen belatedly admitted on an October 16, 2015 call with analysts, the Company observed **four** adverse events related to thrombosis in its ZAF-201 trial, all among patients taking beloranib:

Dennis Kim: In our past clinical trials, we have seen 6 cases of thrombotic findings of varying severity in Beloranib treated patients including 3 cases of pulmonary embolism / deep vein thrombosis or DVT. And one case of DVT alone.

These 6 events were seen in approximately 400 patients treated with Beloranib for period of, of up to one year of treatment. We've had no thrombotic events in the approximately 150 patients treated with placebo.

* * *

Dennis Kim: They're actually 4 cases [of thrombotic events] in the prior studies, and 2 cases in the currently ongoing trial. One is from study 311, and another is from study 203.

* * *

Analyst: Okay. So, uh, after this point I believe we are aware of the 2 thrombotic events, uh, at the 2.4 dose, um, uh, in, in the, in the obesity trial [*i.e.* ZAF-201]. What are the other 2 events [in completed trials]? Can you, uh, in which trial were they in?

Dennis Kim: **They both came from study 201, which is the same trial the 2 events that you're aware of.** Um, the other 2 events, uh, were, uh, what, what can be classified as minor or benign thrombo-embolic, uh, disease. That being

superficial thrombophlebitis… [Emphasis added.]

49. As noted above, Zafgen purportedly categorized the two undisclosed thrombotic adverse events in the ZAF-201 trial as "minor" or "superficial." Nonetheless, all four adverse events were material for investors because the FDA considers the *frequency/rate* of adverse events in determining whether a drug is causing those adverse events.[9] Defendant Hughes conceded as much during a November 10, 2015 analyst call, stating:

> As you recall, on October 16, we announced that our Beloranib IND had been placed on partial clinical hold by FDA in order to assess risk in patients in our ZAF-311 trial. This was prompted by a patient death that had recently occurred and ***in relation to thrombotic events in varying severity*** that had been observed in the course of our prior completed and ongoing randomized studies.
>
> Slide 5 shows the specific thrombotic events that have been observed to date -- I'm sorry, to that point all of which were observed in obese patients who have been treated with Beloranib. Not counting the death we've subsequently determined to be driven by a thromboembolic event, we had observed six ***events of varying severity*** across three trials in our total study population of over 500 patients.

50. Similarly, analysts considered the *frequency/rate* of adverse thrombotic events to be material information for investors determining the value of Zafgen stock. For example:

a. On October 16, 2015, a Leerink Partners ("Leerink") analyst, Joseph Schwartz, wrote that "A total of 6 thrombotic events have been reported on beloranib to date, incl. 1 in ZAF-311, 1 in the Ph.2 severe obesity trial (ZAF-203), and 4 events in the Ph.2 general obesity trial (ZAF-201)."

[9] In other words, any clots developing in patients receiving beloranib—regardless of severity—are material for investors. As the Centers for Disease Control and Prevention ("CDC") explains in its summary of blood clots: "[h]ow a clot affects the body depends on the type and location of the clot." In other words, the severity of a thrombotic event is, in large part, a function of the location of the clot—and whether it moves prior to treatment. Absent some external physical explanation for the location of a clot (such as a long plane flight, *etc.*), there's no reason to think that the less-threatening location of the clots in the non-"serious" adverse events in the ZAF-201 study was anything other than fortuitous.

b. Also on October 16, 2015, JMP Securities ("JMP") issued a research report, stating "while it is not necessarily concerning that a patient died in the PWS trial, considering a 2-3% mortality rate (based on multiple published small studies) for PWS patients, we ***are*** concerned about the historical and ongoing imbalance of thromboembolic events." (emphasis added). That report went on to state that "[a] driving factor in the FDA's decision to place the drug on partial clinical hold was the occurrence of thromboembolic events in ongoing and prior clinical trials," and that "[t]here have been a total of six thromboembolic events (in six different patients) in completed or ongoing clinical trials of beloranib. Three events were pulmonary embolisms/deep vein thrombosis, one was a deep vein thrombosis, and two were superficial thrombophlebitis. These six events occurred in ~400 patients who have received beloranib in clinical trials (1.5% event rate), compared to no events in ~150 patients receiving placebo." The report concluded that the "imbalance [in thrombotic events between those receiving beloranib and those receiving a placebo] is unlikely due to chance." JMP issued another report on October 22, 2015 stating "the primary safety concern we are focused on for beloranib is the increased rate of thromboembolic events given the imbalance that has been observed relative to the placebo control in trials of the drug to date."

c. Cowen and Company ("Cowen") published a report on October 16, 2015 that echoed this analysis. Its analyst, Phil Nadeau, wrote that "an imbalance in thrombotic events has developed. We find the imbalance

particularly worrisome as it calls into question beloranib's risk-benefit." Under the heading "Emerging Association With Thromboembolic Events Troublesome," Nadeau noted that "[i]n the past Zafgen had disclosed that there had been two serious thrombotic adverse events in patients on beloranib, although those events were not attributed to beloranib treatment. This morning Zafgen disclosed that in its clinical trial program a total of 6 thrombotic events occurred in about 400 patients dosed with beloranib (1.5%), compared to no thrombotic events in the 150 patients treated with placebo. … While the cause of the recent death is unknown, this represents another possible thrombotic event. We find this emerging association troubling." Nadeau specifically highlighted the frequency of thrombotic adverse events, writing that "with 6 events on beloranib and none on placebo, the imbalance is worrisome, and an association between beloranib and thrombotic events certainly seems to be emerging. This clearly increases the risk associated with beloranib development, and we expect the FDA and Zafgen to closely examine beloranib's risk-benefit in all populations." In a November 10, 2015 report, Nadeau echoed this analysis, noting "a total of 7 thrombotic events in about 400 patients dosed with beloranib," and writing that "[w]e find the association between beloranib and thrombosis troubling, and think it increases the risk to beloranib's development."

d. On October 19, 2015, a Royal Bank of Canada ("RBC") analyst, Simos Simeonidis, wrote "In addition to examining beloranib's proposed

[mechanism of action], we have to look at the reported number of thrombotic events from beloranib's trials," noting that "we have six thrombotic events in ~400 patients treated with beloranib, vs. zero events in 150 placebo patients. These numbers, albeit small, point to a potential signal (1.5% vs. 0%)." On October 22, 2015, Simeonidis issued another report taking a somewhat stronger view, stating that "Even though we're dealing with uneven dataset sizes (400 vs. 150), the numbers most likely point to a signal: 7 thrombotic events in ~400 patients on drug vs. 0 events in ~150 patients on placebo."

### E. The Partial Disclosures Made Misleading By Material Omissions

51. Defendants made repeated misleading partial disclosures regarding the thrombotic adverse events that the Company observed in the ZAF-201 trial. Zafgen's Form S-1 contained a discussion about the results the Company observed from the ZAF-201 trials. The disclosures relating to the ZAF-201 trial included adverse events, among other data and information.

52. In its Form S-1, signed by Defendant Hughes, that Zafgen filed on April 18, 2014 in connection with its initial public offering, in the section discussing the ZAF-201 study, Zafgen disclosed, in relevant part:

> As severely obese patients are at an increased risk for cardiovascular disease, we measured systemic biomarkers of cardiovascular disease risk, including low density lipoprotein cholesterol, HDL, CRP, trigylcerides and blood pressure in trial participants, to determine beloranib's impact on such biomarkers. The results of these biomarker measurements in this trial, as summarized below, suggest that **beloranib treatment does not increase the risk of cardiovascular disease and may be associated with reduced cardiovascular disease risk.**
>
> * * *
>
> There were no deaths or any SAEs deemed to be possibly, probably, or definitely related to beloranib, although there were **two serious thrombotic adverse events** which, while not attributed to beloranib treatment, may point to the utility of

> assessment of prior history of thrombotic events in patients enrolled in subsequent trials and added vigilance for AEs related to blood clotting during future clinical trials. The most commonly reported TEAEs [treatment-emergent adverse events] were gastrointestinal disorders, mainly nausea, diarrhea, or vomiting, nervous system disorders, mainly dizziness, and psychiatric disorders, mainly insomnia, sleep disorder, or abnormal dreams. TEAEs were generally mild in severity and transient. Other frequently reported TEAEs were headaches and injection site bruising/itching, although the incidences were comparable to placebo and not observed to be dose-related.

53. Defendants were well aware of all adverse events relating to beloranib from the ZAF-201 study. Having chosen to reveal two thrombotic adverse events that occurred in the ZAF-201 trial of beloranib, to state that those events were not "deemed to be possibly, probably, or definitely related to beloranib," to state that beloranib treatement did not increase the risk of cardiovascular disease, and disclosing adverse events as minor as nausea, abnormal dreams, or itching at the injection site, Defendants misled investors by failing to reveal that, in total, four thrombotic adverse events occurred in that trial among patients taking beloranib. Defendants also failed to disclose that zero patients receiving a placebo experienced thrombotic adverse events. In the alternative, Defendants omitted to disclose the material fact that they did not disclose *all* adverse events observed in patients taking beloranib. By providing an extensive list of even minor adverse events—nausea, dizziness, abnormal dreams, and so on—a reasonable investor would be misled into believing that all material adverse events were revealed when, in fact, they were not.

54. Prior to October 16, 2015, the Company had not disclosed any thrombotic adverse events in clinical trials of beloranib other than the two events in the ZAF-201 trial described above. Therefore Defendants misled investors by failing to disclose that there were four thrombotic adverse events that occurred in patients taking beloranib in the ZAF-201 clinical trial.

55. The misleading statements quoted above—describing two serious thrombotic adverse events in the ZAF-201 trial, stating that those events were not "deemed to be possibly,

probably, or definitely related to beloranib," stating that beloranib treatement did not increase the risk of cardiovascular disease, and disclosing adverse events as minor as nausea, abnormal dreams, or itching at the injection site, while failing to disclose that, in total, four thrombotic adverse events occurred in patients receiving beloranib in the ZAF-201 trial—were repeated verbatim in the following subsequent SEC filings by Zafgen, each of which was signed by Defendant Hughes:

a. Form S-1/A filed on April 28, 2014;

b. Form S-1/A filed on May 2, 2014;

c. Form S-1/A filed on June 2, 2014;

d. Form S-1/A filed on June 5, 2014; and

e. Form 424B4 filed on June 19, 2014.

56. These statements were misleading for the reasons provided in paragraphs 53-54 above.

57. Zafgen again repeated these statements verbatim in filings made in connection with a follow-on public offering in January 2015. In the Form S-1 that Zafgen filed on January 12, 2015, in connection with a follow-on offering, Zafgen made the same misleading partial disclosure in the section discussing the ZAF-201 study:

> As severely obese patients are at an increased risk for cardiovascular disease, we measured systemic biomarkers of cardiovascular disease risk, including low density lipoprotein cholesterol, HDL, CRP, trigylcerides and blood pressure in trial participants, to determine beloranib's impact on such biomarkers. The results of these biomarker measurements in this trial, as summarized below, suggest that **beloranib treatment does not increase the risk of cardiovascular disease and may be associated with reduced cardiovascular disease risk.** While we plan to include biomarkers of cardiovascular disease risk as an endpoint for our planned Phase 2b clinical trial of beloranib as a treatment for severe obesity in the general population, this trial will not be designed to establish the impact of beloranib treatment on cardiovascular disease risks.

* * *

> There were no deaths or any SAEs deemed to be possibly, probably, or definitely related to beloranib, although there were **two serious thrombotic adverse events** which, while not attributed to beloranib treatment, may point to the utility of assessment of prior history of thrombotic events in patients enrolled in subsequent trials and added vigilance for AEs related to blood clotting during future clinical trials. The most commonly reported TEAEs were gastrointestinal disorders, mainly nausea, diarrhea, or vomiting, nervous system disorders, mainly dizziness, and psychiatric disorders, mainly insomnia, sleep disorder, or abnormal dreams. TEAEs were generally mild in severity and transient. Other frequently reported TEAEs were headaches and injection site bruising/itching, although the incidences were comparable to placebo and not observed to be dose-related.

58. These statements were misleading for the reasons provided in paragraphs 53-54 above.

59. The statements quoted above were repeated verbatim in the following subsequent filings by Zafgen, each of which was signed by Defendant Hughes:

a. Form S-1/A filed on January 16, 2015; and

b. Form 424B4 filed on January 23, 2015.

60. These statements were misleading for the reasons provided in paragraphs 53-54 above.

61. Most recently, the statements quoted above were repeated verbatim in the Form 10-K filed by Zafgen on March 25, 2015, which was signed by Defendant Hughes.

62. These statements were misleading for the reasons provided in paragraphs 53-54 above.

### F. Someone Leaks Bad News About Beloranib

63. On October 12, 2015, Zafgen shares suddenly dropped sharply—opening at $34.76/share and closing at $22.15/share. Zafgen shares continued their slide on October 13, 2015. After opening at $22.17/share, the stock closed at $15.75/share.

64. The only publicly available news that appeared to contribute to the drop was a report that the Company had cancelled an upcoming scheduled appearance at an RBC Capital Conference.

65. As the Boston Globe reported on October 14, 2015, however, rumors of a patient death in the beloranib study were circulating as early as October 13, 2015. As first reported by the Globe, on October 13, 2015 at 3:35 pm, a commenter on a Yahoo! Finance message board wrote "What type of horrific safety issue with Beloranib? Patient died, but can be not treatment related...Prepare for the worst bomb...Just let me know..." The Globe's report provided a screenshot of that post:




66. Also on October 13, 2015, the pharmaceutical-industry news site *Fierce Biotech* reported that "[r]umors about potential trouble with the biotech's lead drug, beloranib, provided all the dry tinder needed to heat up speculation."

67. A contemporaneous analyst report also reflected hints of a safety problem. In an October 13, 2015 report, Simos Simeonidis, an analyst with RBC Capital issued a report titled "What could be going on with ZFGN." After describing the dramatic drop in price, the report listed a number of potential explanations of what could be going on, including "Safety issue with beloranib," which Simeonidis classified as "possible" with a 35% likelihood. His report did note, however, the market's view that "the drug has had a relatively benign safety profile until now," demonstrating the effect of the Company's misleading partial disclosures.

### G. Zafgen Tries To Calm The Panic With A Misleading Partial Disclosure

68. At approximately 11:59 am on October 14, 2015 (the "October 14 Statement"), Zafgen issued a press release, stating, in relevant part, as follows:

> **Zafgen Issues Statement**
>
> BOSTON, Oct. 14, 2015 (GLOBE NEWSWIRE) -- Zafgen, Inc. (Nasdaq:ZFGN), a biopharmaceutical company dedicated to significantly improving the health and well-being of patients affected by obesity and complex metabolic disorders, today issued the following statement:
>
> "Zafgen recently learned of a patient death which occurred in the Company's ongoing double-blind, randomized, placebo-controlled Phase 3 bestPWS study of beloranib in Prader-Willi Syndrome, a rare genetic disorder with a high rate of mortality linked to obesity and its co-morbidities. The cause of death remains unknown at this time. According to normal practice, the event was reported to the U.S. Food and Drug Administration, at which point the Agency initiated a discussion with the Company. The Company is working with the Agency to expedite a review and understanding of this event, and to determine implications of the event on the conduct of the trial, and anticipates providing an update as its discussions with the Agency progress. The thoughts of the Company are with the family of the patient at this time. Zafgen remains committed to ensuring the safety of all patients enrolled in its studies."

69. Notably, the Company's October 14 Statement failed to disclose that the patient who died was receiving beloranib and was not in the control group that was receiving a placebo. The Company's October 14 Statement also failed to disclose any information regarding past thrombotic adverse events.

70. The October 14 Statement caused a sharp increase in the Company's stock price. After trading as low as $10.90/share, Zafgen stock closed on October 14, 2015 at $19.50 per share. The stock continued to trade up on October 15, 2015, as high as $22.15/share and closing at $21.02/share.

### H. FDA Action Forces The Company To Reveal The Truth

71. On October 16, 2015, the Company issued a second press release (the "October 16 Statement"). That release stated, in relevant part, as follows:

> **ZAFGEN ANNOUNCES PARTIAL CLINICAL HOLD AFFECTING BELORANIB TRIALS**
>
> INVESTOR CONFERENCE CALL TODAY, OCTOBER 16TH, AT 8:30 A.M. E.T.
>
> BOSTON, Oct. 16, 2015 (GLOBE NEWSWIRE) -- Zafgen, Inc. (Nasdaq:ZFGN), a biopharmaceutical company dedicated to significantly improving the health and well-being of patients affected by obesity and complex metabolic disorders, today announced that it received verbal notice late yesterday from the U.S. Food and Drug Administration (FDA) that beloranib has been placed on partial clinical hold. This partial clinical hold impacts ongoing or planned clinical trials, including ZAF-311 and ZAF-312. A partial clinical hold is an order that the FDA issues to delay or suspend part of a sponsor's clinical work requested under its investigational new drug (IND) application.
>
> As previously reported, Zafgen learned of a death in the ongoing Phase 3 bestPWS study (ZAF-311) of beloranib in Prader-Willi Syndrome (PWS). While the cause of death remains unknown, the patient's treatment assignment has been unblinded and it is now known that the patient was receiving beloranib. Due to previously reported thromboembolic events in ongoing and prior clinical trials of beloranib and the unknown nature of the death, the FDA gave verbal notice of a partial clinical hold to institute measures to ensure patient safety. Patients currently participating in the ZAF-311 study will be screened for existing thrombotic disease prior to receiving further study drug and regularly monitored through the completion of the study. Given that the study is near complete, at this time, the Company expects to report top-line results in the first quarter of 2016. Similar screening and monitoring is being considered for the ongoing Phase 2b study (ZAF-203) in patients with severe obesity complicated by type 2 diabetes. The Company now anticipates that the PWS Phase 3 clinical trial, ZAF-312, will be initiated after ZAF-311 is completed and a full assessment of the safety and efficacy of beloranib is performed by the FDA.

> "Patient safety is our top priority, and we will work closely with the FDA to implement these measures to support the further development of beloranib," said Dr. Thomas Hughes, Chief Executive Officer of Zafgen.

72. In a conference call held on October 16, 2015 (the "October 16 Call"), Zafgen's Chief Medical Officer, Dennis Kim, M.D. disclosed that:

> In our past clinical trials, we have seen six cases of thrombotic findings of varying severity in beloranib-treated patients including three cases of pulmonary embolism/deep vein thrombosis or DVT and one case of DVT alone. The six events were seen in approximately 400 patients treated with Beloranib for a period up to one year of treatment. We've had no thrombotic events in the approximately 150 patients treated with placebo.

73. In the question-and-answer segment of the call, Dr. Kim was asked "The six cases that you mentioned before, those are all in prior studies, is that correct?" He replied, "There are actually four cases in prior studies and two cases in currently ongoing trials. One is from study 311 and another is from study 203." He then clarified that all four thrombotic adverse events that occurred in completed studies "came from study 201."

74. Zafgen had issued a press release on September 9, 2015, announcing that "it ha[d] completed enrollment of ZAF-203, a Phase 2b clinical trial of beloranib in the treatment of patients with both severe obesity and type 2 diabetes. The trial enrolled 152 patients across 16 sites in Australia." Therefore, the adverse thrombotic event that occurred in ZAF-203 almost certainly occurred between September 9, 2015 and October 16, 2015.

75. In the wake of these corrective disclosures, the Company's share price plummeted. After closing at $21.02/share on October 15, 2015, Zafgen stock closed at $10.36/share on October 16, 2015.

76. The Company was notably evasive about the date on which it learned of the patient death in the ZAF-311 trial. On the October 16, 2015 call, an analyst asked Defendant

Hughes, Zafgen's CEO, exactly when the Company learned of the patient death. Hughes avoided answering the question, stating:

> Patient confidentiality always matters and just be clear, we do not, nor should we ever find out the actual identity of this patient or of their family who is still dealing with this horrible event. So, for patient confidentiality, in order to keep people from tracking into it, we can't provide a specific date, but it was about two weeks ago.

### I. Heavy Insider Selling

77. The revelations described above followed closely on the heels of heavy selling by insiders in September 2015. As alleged, none of the Company's officers had sold *any* shares in Zafgen prior to September 2015 and by selling their stock in September 2015, just weeks before the revelation of the additional adverse events surrounding beloranib and the patient death, these executives collectively avoided losing almost $3.5 million.

78. Defendant Hughes, the Company's CEO, sold 22,500 shares of Zafgen on September 17, 2015 and sold another 23,126 shares on September 18, 2015. The combined value of those two sales was $1,940,670 for a net profit of $1,872,070 (*i.e.*, after accounting for the cost of exercising the underlying options). Had Dr. Hughes sold at the closing price on October 16, 2015, those shares would have been worth just $472,685.36. After all of his transactions in September 2015, Dr. Hughes owned just 11,320 shares of Zafgen. Dr. Hughes's reports to the SEC regarding these transactions claimed that the trades were made pursuant to a Rule 10b5-1 trading plan but did not identify the date on which the trading plan was adopted. Because the Class Period covers the entire period that Zagen has been a public company, it is highly likely that the trading plan was adopted during the Class Period. Dr. Hughes had never made any filings with the SEC describing any sales of Zafgen stock prior to September 2015.

79. Dennis Kim, the Company's Chief Medical Officer, sold 593 shares of Zafgen on September 14, 2015, sold 30,625 shares of Zafgen on September 15, 2015, and sold 9,142 shares

of Zafgen on September 17, 2015. The combined value of these three sales was $1,614,400 for a net profit of $1,551,600. Had Dr. Kim sold at the closing price on October 16, 2015, those shares would have been worth just $418,129.60. After all of his transactions in September 2015, Dr. Kim owned zero shares of Zafgen. Dr. Kim's reports to the SEC regarding these transactions claimed that the trades were made pursuant to a Rule 10b5-1 trading plan adopted on May 28, 2015. Dr. Kim had never made any filings with the SEC describing any sales of Zafgen stock prior to September 2015.

80. Alicia Secor, the Company's Chief Commercial Officer, sold a total of 26,256 shares of Zafgen in two separate transactions on September 17, 2015. The combined value of those two sales was $1,077,808.80 for a net profit of $836,058.80. Had Ms. Secor sold at the closing price on October 16, 2015, those shares would have been worth just $272,012.16. After all of her transactions in September 2015, Ms. Secor owned zero shares of Zafgen. Ms. Secor's reports to the SEC regarding these transactions claimed that the trades were made pursuant to a Rule 10b5-1 trading plan but did not identify the date on which the trading plan was adopted. Because the Class Period covers the entire period that Zagen has been a public company, it is highly likely that the trading plan was adopted during the Class Period. Ms. Secor had never made any filings with the SEC describing any sales of Zafgen stock prior to September 2015.

81. On September 18, 2015, Avi Goldberg, who was, at the time, a member of Zafgen's board of directors sold 5,000 shares of Zafgen. Following the sale, Mr. Goldberg owned 53,734 shares of Zafgen. Mr. Goldberg's report to the SEC regarding this transaction claimed that the trade was made pursuant to a Rule 10b5-1 trading plan but did not identify the date on which the trading plan was adopted. Because the Class Period covers the entire period that Zagen has been a public company, it is highly likely that the trading plan was adopted during

the Class Period. On September 30, 2015, Zafgen announced that Mr. Goldberg was resigning as a director.

82. On September 24, 2015, through multiple transactions, Third Rock Ventures sold 136,579 shares of Zafgen or over 39% of its total holdings. Following the sale, it owned 210,371 shares of the Company. At the time of these transactions, Kevin Starr, a Third Rock partner, was a member of Zafgen's board of directors. On September 30, 2015, Zafgen announced that Mr. Starr was resigning as a director.

## CLASS ACTION ALLEGATIONS

83. Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a Class of all persons and entities who purchased or otherwise acquired Zafgen common stock between June 19, 2014 and October 16, 2015, inclusive, and were damaged thereby. Excluded from the Class are Zafgen and its officers and directors, as well as their families and affiliates.

84. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

85. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

a. Whether Defendants violated the Exchange Act;

b. Whether Defendants omitted and/or misrepresented material facts;

c. Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

d. Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

e. Whether the price of Zafgen stock was artificially inflated; and

f. The extent of damage sustained by Class members and the appropriate measure of damages.

86. Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class sustained damages from Defendants' wrongful conduct alleged herein.

87. Plaintiffs will adequately protect the interests of the Class and have retained counsel who are experienced in class action securities litigation. Plaintiffs have no interests that conflict with those of the Class.

88. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**FRAUD ON THE MARKET**

89. Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine that, among other things:

a. Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b. The omissions and misrepresentations were material;

c. The Company's common stock traded in efficient markets;

d. The misrepresentations alleged herein would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

e. Plaintiffs and other members of the Class purchased Zafgen common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

90. At all relevant times, the markets for Zafgen common stock were efficient for the following reasons, among others: (i) Zafgen filed periodic public reports with the SEC; and (ii) Zafgen regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire serves and through other wide-ranging public disclosures such as communications with the financial press, securities analysts, and other similar reporting services. Plaintiffs and the Class relied on the price of Zafgen common stock, which reflected all information in the market, including the misstatements by Defendants.

**NO SAFE HARBOR**

91. The statutory safe harbor provided for forward-looking statements under certain statements does not apply to any of the allegedly false statements pleaded in this Complaint. The specific statements pleaded herein were not forward-looking statements.

92. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

**LOSS CAUSATION**

93. On October 12 and 13, 2015, news regarding problems with beloranib leaked into the market causing Zafgen's stock price to fall from $34.76/share to $15.75 per share. The market began to learn of potential issues with beloranib including the possible death of a patient involved in the clinical studies.

94. On October 16, 2015, before the markets opened, Zafgen disclosed that, in addition to the first patient death, "[i]n … past clinical trials, [it had] seen six cases of thrombotic findings of varying severity in beloranib-treated patients including three cases of pulmonary embolism/deep vein thrombosis or DVT and one case of DVT alone. The six events were seen in approximately 400 patients treated with Beloranib for a period up to one year of treatment. [There were] no thrombotic events in the approximately 150 patients treated with placebo." Zafgen further disclosed that four of these thrombotic events had occurred in ZAF-201—two more than had been previously disclosed.

95. Between the close of trading on October 15, 2015 and the close of trading on October 16, 2015, Zafgen shares declined by $10.66/share or 50.7%. This decline is directly attributable to the October 16, 2015 corrective disclosures.

## CAUSES OF ACTION

### COUNT I
### Violation of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder
### (Against All Defendants)

96. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

97. During the Class Period, Defendants disseminated or approved the false statements specified above, which it knew or deliberately disregarded as misleading in that it contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

98. Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 in that it (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and

(iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon those who purchased or otherwise acquired Zafgen securities during the Class Period.

99. Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Zafgen common stock. Plaintiffs and the Class would not have purchased Zafgen stock at the price paid, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

**COUNT II**
**Violation of § 20(a) of the Exchange Act**
**(Against Thomas E. Hughes)**

100. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

101. Hughes acted as a controlling person of Zafgen within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of his high-level position at the Company, Hughes had the power and authority to cause or prevent Zafgen from engaging in the wrongful conduct complained of herein. Hughes signed and/or was provided with or had unlimited access to the statements alleged by Plaintiffs to be misleading both prior to and immediately after their publication, and had the ability to prevent the issuance of these materials or to cause them to be corrected so as not to be misleading.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

102. Determining that this action is a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class as defined herein, and a certification of Plaintiffs as class representatives pursuant to Rule 23 of the Federal Rules of Civil Procedure and appointment of Plaintiffs' counsel as Co-Lead Counsel;

103. Awarding compensatory and punitive damages in favor of Plaintiffs and the other Class members against Defendants, for all damages sustained as a result of Defendants' wrongdoing, in an amount proven at trial, including pre-judgment and post-judgment interest thereon.

104. Awarding Plaintiffs and other members of the Class their costs and expenses in this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; and

105. Awarding Plaintiffs and the other Class members such other relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury in this action of all issues so triable.

Dated: February 22, 2016

Respectfully submitted,

/s/ Jeffrey C. Block

BLOCK & LEVITON LLP
Jeffrey C. Block (BBO # 600747)
Joel A. Fleming (BBO # 685285)
Bradley Vettraino (BBO # 691834)
Jeff@blockesq.com
Joel@blockesq.com
Bradley@blockesq.com
155 Federal Street, Suite 400
Boston, Massachusetts 02110
(t) (617) 398-5600
(f) (617) 507-6020

*Attorneys for Lead Plaintiffs Terry Brennan, Ron Kenner, and Kevin Koziatek, and Plaintiff Jeffrey Buterbaugh, and Co-Lead Counsel for the Putative Class*

Phillip Kim
Jacob Goldberg
THE ROSEN LAW FIRM, P.A.
275 Madison Avenue, 34th Floor
New York, NY 10016
Tel.: 212.686.1060
Fax: 212.202.3827
pkim@rosenlegal.com

*Attorneys for Lead Plaintiffs Vincent Rampe and Dragon Gate Management, and Co-Lead Counsel for the Putative Class*

## CERTIFICATE OF SERVICE

I, Joel Fleming, hereby certify that a copy of the foregoing document, filed through the CM/ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ Joel Fleming
Joel Fleming